# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

**VILONIA SCHOOL DISTRICT**                                                        **PLAINTIFF**

**v.**                                          **Case No. 4:18-cv-00219-KGB**

**M.S. AND T.S., AS PARENTS OF A.R.S.**                                    **DEFENDANTS**

## ORDER

Before the Court are plaintiff Vilonia School District's ("School District") appeal of final administrative decision in Case No. EH-18-23 and appeal of final administrative decision in Case No. H-18-22 (Dkt. Nos. 31, 51). Defendants M.S. and T.S., as parents of the juvenile A.R.S. ("Parents"), responded to both motions (Dkt. Nos. 34, 55). This case involves a juvenile student of School District who used a social media platform allegedly to make threats of self-harm and harm to others while off-campus; the student receives education services pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1044 *et seq.* School District's first pending motion is an appeal of the hearing officer's final administrative decision following the expedited due process hearing conducted in Case No. EH-18-23 (Dkt. No. 31). School District's second pending motion is an appeal of the hearing officer's final administrative decision following the regular due process hearing conducted in Case No. H-18-22 (Dkt. No. 51).

Also before the Court is School District's motion for leave to file first amended appeal of final administrative decisions (Dkt. No. 58). Parents responded to the motion, and School District filed a reply (Dkt. Nos. 59, 61). School District requests leave to file an amended appeal in order to supplement the original appeals with citations to the record, testimony, and final administrative decisions issued by the hearing officer at the administrative hearing stage of this case (Dkt. No. 58, ¶ 2). Parents argue that School District's motion is untimely and without good cause (Dkt. No.

59, ¶ 4).  The Court will allow School District to file the amended appeal to supplement its original appeals with record cites.  For this reason, the Court grants School District's motion for leave to file first amended appeal of final administrative decision (Dkt. No. 58).  School District will have 10 days from the date of this Order to file their proposed amended appeal.  The Court made its determination on the pending appeal of final administrative decision and appeal of final administrative decision in Case No. H-18-22 after reviewing School District's proposed amended appeal.

For the following reasons, the Court denies School District's appeals and affirms the Hearing Officer's Final Decisions and Orders in the expedited due process hearing conducted in Case No. EH-18-23 and the due process hearing conducted in Case No. H-18-22 (Dkt. Nos. 31, 51).

## I.    Procedural Background

On March 13, 2018, Parents filed a due process complaint notice with the Arkansas Department of Education ("ADE"), designated as ADE Special Education Unit Case No. H-18-22.  On March 23, 2018, School District filed a response to Parents' due process complaint and an expedited due process complaint notice with the ADE, requesting a change in placement for A.R.S. as a counter-complaint to Parent's complaint, designated as ADE Special Education Unit Case No. EH-18-23.

On April 11, 2018, this Court entered an Order granting School District's request for a preliminary injunction until the  ADE due process hearing officer issued his order  finalizing A.R.S.'s long-term placement through the administrative review process or until further Order of this Court, whichever occurred first (Dkt. No. 20, at 46).  This Court's Order also placed A.R.S. on home-bound setting where School District was to provide a staff member to educate A.R.S. at

an appropriate location until A.R.S.'s long-term placement could be finalized through the administrative review process of the IDEA, or, if Parents preferred, A.R.S. be placed in a day treatment facility until A.R.S.'s long-term placement could be finalized through the IDEA's administrative review process (*Id.*).

On the morning of April 12, 2018, the state hearing officer, Robert B. Doyle, Ph.D., held the expedited due process hearing. Immediately after the conclusion of the expedited due process hearing, Dr. Doyle started the regular due process hearing that took place on April 12, 13, and 26, 2018.

On April 16, 2018, School District filed a motion to compel compliance with subpoena and motion for protective order (Dkt. Nos. 21, 23). On April 23, 2018, this Court entered an Order denying without prejudice both of School District's motions (Dkt. No. 29).

In the expedited due process complaint, pursuant to 20 U.S.C. § 1415(k), School District requested a change of placement of A.R.S. to an appropriate interim alternative educational setting for not more than 45 school days because maintaining the current placement of A.R.S. was substantially likely to result in injury to A.R.S. or to others (School District's Response, at 8-9). On April 27, 2018, Parents filed a notice of final decision from expedited due process hearing (Dkt. No. 30).

In the Final Decision and Order entered on April 27, 2018, the Hearing Officer ordered the following relief:

> 1. The District will immediately upon receipt of this order notify the Parents and the Student that he will be receiving his special education services at the previously agreed upon location as contained in his amended [individualized education plan ("IEP")] of October 25, 2017.
>
> 2. The District will immediately upon receipt of this order, but no later than April 30, 2018, schedule an IEP conference to be held at a time and place agreeable to the Parents and the Department's Brain Injury Consultant. The purpose of the

conference will be to determine the most appropriate and least restrictive environment in which to provide the Student's special educational needs, including any necessary supports and related services as dictated by his qualifying disability of Traumatic Brain Injury.

(Dkt. No. 30-1, at 18-19). On April 30, 2018, School District filed with this Court an appeal of the final administrative decision (Dkt. No. 31). Parents answered the appeal and filed a counterclaim (Dkt. No. 34).

In the regular due process complaint, Parents requested:

1. The Parents be entitled to place [A.R.S.] in a private school placement at District expense or Compensatory Special Education and Related Service for the denial of Free Appropriate Public Education.

2. The development of an appropriate IEP to be implemented in the Least Restrictive Environment, specifically to include a Functional Behavior Assessment, Behavioral Intervention Plan, individualized instructional program to address [A.R.S.'s] TBI deficits and depression and their impact on his academic achievement, social skills training, and teaching strategies to address [A.R.S.'s] behavioral and emotional dysfunction and to provide opportunities for rehabilitation with and interaction with [A.R.S.'s] non-disabled peers. . . .

(Parents' Due Process Complaint, at 13).

On May 14, 2018, this Court entered an Order granting the Parents' motion for a preliminary injunction requiring School District to comply with the Final Decision and Order from the expedited due process hearing entered on April 27, 2018, by Dr. Doyle, at least until such time as this Court resolved the pending appeal of final administrative decision or until further Order of this Court, whichever occurs first (Dkt. No. 42). In that Order, this Court also ordered the parties to provide a status report on May 24, 2018, the last day of school for the Vilonia School District (*Id.*, at 16). Both parties filed a status reported on May 24, 2018, and School District filed a response to the Parents' status report on June 1, 2018 (Dkt. Nos. 45, 46, 50).

On May 25, 2018, Dr. Doyle entered the Final Decision and Order regarding the regular due process hearing, ordering the following relief:

1. The District will immediately upon receipt of this order implement the order as directed in the final decision of the expedited hearing on placement. . .

2. If the above order has not been implemented the date for completion of the action as ordered in [the second part of the relief ordered in the expedited due process hearing] will be implemented no later than June 15, 2018.

3. The District will upon receipt of this order make arrangements to provide the Student with sufficient compensatory special education services to provide him with the opportunity to obtain the equivalent credits towards graduation as expected of other ninth grade students in the District.

4. The District will upon receipt of the order, but no later than August 1, 2018, make arrangements to provide teaching strategies to teachers as well as other support staff through the Department's CIRCUIT process.

5. The District will upon receipt of this order, if not having already done so, will no later than August 1, 2018, make arrangements for the Student to receive an occupational therapy evaluation.

6. Finally, the District will within one month of the beginning of school year 2019-20 conduct a functional behavior assessment to determine the need for behavior interventions and the development of an appropriate IEP with the assistance and guidance of a behavior expert as agreed to by the Parents.

(HO Regular Due Process Final Decision and Order, at 46-47).

On August 20, 2018, School District filed an appeal of final administrative decision in ADE Special Education Unit Case No. H-18-22 (Dkt. No. 51). Parents answered the appeal (Dkt No. 55).

## II.     Factual Background

The Court included a detailed account of the facts and procedural background of this case in the Orders from April 11 and May 14, 2018 (Dkt. Nos. 20, 42). The Court will not repeat it here. Based on the parties' status reports and response to the status report, the relevant factual background in this case has continued to evolve since the Court's Order from May 14, 2018 (Dkt. Nos. 45, 46, 50).

According to School District's and Parents' status reports and School District's response to Parents' status report, the parties agree to the following facts concerning A.R.S.'s return to Vilonia Freshman Academy. A.R.S. returned to Vilonia Freshman Academy at the scheduled time on May 16, 2018 (Dkt. Nos. 46, ¶ 1; 50, ¶ 1). On that same day, an IEP meeting was held to determine A.R.S.'s education placement and schedule for May 17-24, 2018 (Dkt. Nos. 46, ¶ 2; 50, ¶ 2). A.R.S. underwent various testing for the next three days (Dkt. Nos. 46, ¶ 3; 50, ¶ 3). A.R.S.'s last day at school was May 22, 2018, and he did not report to school for his final day of class (*Id.*).

According to Parents' status report, at the May 16, 2018, IEP meeting, "[n]o other plans were made or have been made . . . for a Summer Program or any educational services to be provided to A.R.S." (Dkt. No. 46, ¶ 2). Parents assert that A.R.S. did not attend the final day of school "[d]ue to the actions of the District . . . ." (*Id.*, ¶ 3). Parents further assert that "[w]hile refusing to allow A.R.S. to be placed in an appropriate residential facility as recommended by the [Traumatic Brain Injury ("TBI")] Consultant since March 26, 2018, the District has intentionally disobeyed the ADE Hearing Officer's Orders and this Court's Order in providing any educational services to A.R.S." (*Id.*, ¶ 4). Parents also assert that School District "has intentionally created a hostile environment—thereby making it impossible for A.R.S. to return to the District—despite his right to do." (*Id.*). In support of this assertion, Parents attached as exhibits to their status update: social media posts allegedly made by a School District employee regarding this case; School District's Social Networking and Ethics policy; a declaration from A.R.S.'s mother that School District has failed to provide educational services and School District personnel ridiculed A.R.S. by telling him about news articles written about the case; and a local newspaper article that allegedly contains confidential information that the School District Superintendent and local police

gave to the press (Dkt. No. 46, Exs. A-D). School District denies the above allegations from Parents' status report (Dkt. No. 50, ¶¶ 2-6)

According to School District's response to Parents' status report, "the parties agreed that a speech language evaluation and executive functioning assessments would be conducted over the summer to inform decisions on A.R.S.'s programming and placement for the 2018-2019 school year, all of which would be discussed and finalized at another IEP meeting prior to the start of the 2018-2019 school year." (Dkt. No. 50, ¶ 2). School District also asserts that the parties discussed whether A.R.S. should repeat the ninth grade, and School District "asked the Parents to consider the use of credit recovery classes (to be taught by a special education teacher with experience in traumatic brain injury) to make up for the credits not received in the spring semester of the 2017-2018 school year." (*Id.*). School District further asserts that "it has communicated on numerous times to Defendants since March 2, 2018, that it stood ready, willing and available to provide homebound services to A.R.S. or to facilitate admission to a day treatment program to serve A.R.S." (*Id.*, ¶ 4). School District also asserts that Parents "have rejected the provision of day treatment services and failed to provide the District with the dates or locations at which A.R.S. would be made available for the District to provide homebound services to A.R.S." (*Id.*). Finally, School District asserts that "it has not released confidential information, and that the views expressed in the social media posts are solely those of the author of the posts in his personal capacity and do not in any way represent the views of the District . . . ." (*Id.*, ¶ 5).

## III.    Standard Of Review

The IDEA requires all local educational agencies receiving federal funds to implement policies "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."

20 U.S.C. § 1415(a).  A party challenging whether a free appropriate public education has been provided has the right to file an administrative complaint and receive an impartial due process hearing before a local or state agency.  *Id*. § 1415(b)(6).  An aggrieved party who has no further administrative appeal has the right to seek review of the decision made in a due-process hearing in federal district court without regard to the amount in controversy.  *Id*.  § 1415(i)(2)(A) and (3)(A).

"Because judges are not trained educators, judicial review under the IDEA is limited." *E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 569 (8th Cir. 1998).  In actions brought under the IDEA, a district court serves a quasi-appellate function while remaining a court of original jurisdiction.  *See Kirkpatrick v. Lenoir Cnty. Bd. of Educ.*, 216 F.3d 380, 387 (4th Cir. 2000) ("[W]hile a federal district court may review a state review officer's decision and even defer to that decision, the federal district court does not sit as an appellate court.  Federal district courts are courts of limited, original jurisdiction with no power to sit as appellate tribunals over state court or administrative proceedings.").

The Eighth Circuit has explained that a district court's role in reviewing a claim brought under the IDEA is to receive the records of the administrative proceedings, to hear additional evidence at the request of a party, and to grant such relief as the court determines is appropriate based on the preponderance of the evidence.  *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011); *see also* 20 U.S.C. § 1415(i)(2)(C).  District courts must independently determine whether the school district provided A.R.S. with a free appropriate public education, giving "due weight" to the state administrative proceedings.  *K.E. ex rel. K.E.*, 647 F.3d at 803.  "This somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *Id*. (quoting *Indep. Scho.*

*Dist. No. 283 v. S.D. by J.D.*, 88 F.3d 556, 561 (8th Cir. 1996)). It is nevertheless appropriate "because the administrative panel had an opportunity to observe the demeanor of the witnesses and because the court should not substitute its own educational policy for those of the school authorities that they review." *Strawn v. Mo. State Bd. of Educ.*, 210 F.3d 954, 958 (8th Cir. 2000). Further, the party challenging the outcome of the state administrative hearing bears the burden of proof. *E.S.*, 135 F.3d at 569; *Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21 v. Ill. State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir. 1991).

**IV.     Relevant IDEA Provisions**

In the Hearing Officer's Final Decision and Order in the expedited due process hearing, he denied School District's request for a change of placement of A.R.S. to an appropriate interim alternative educational setting for not more than 45 school days under 20 U.S.C. § 1415(k)(3)(B). That section of the IDEA states in pertinent part:

(B) Authority of hearing officer

(i) In general:  A hearing officer shall hear, and make a determination regarding, an appeal requested under subparagraph (A).

(ii) Change of placement order:  In making the determination under clause (i), the hearing officer may order a change in placement of a child with a disability. In such situations, the hearing officer may:

(I) return a child with a disability to the placement from which the child was removed; or

(II) order a change in placement of a child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or to others.

20 U.S.C. § 1415(k)(3)(B).

In the Hearing Officer's Final Decision and Order from the due process hearing, he determined that School District failed to provide A.R.S. with a free appropriate public education (HO Regular Due Process Final Decision and Order, at 45).

The IDEA requires local agencies to provide students with disabilities a free appropriate public education. *Lathrop R-11 Sch. Dist. v. Gray*, 611 F.3d 419, 424 (8th Cir. 2010). The primary tool for implementing the aims of the IDEA is the individualized education plan ("IEP"), which "tailor[s] the statutorily required 'free appropriate public education' to each child's unique needs." *Honig v. Doe,* 484 U.S. 305, 311 (1988) (quoting 20 U.S.C. § 1414(a)(5)).

The IDEA does not require schools to ensure that disabled students acquire specific knowledge. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 198 (1982). In fact, the IDEA does not require schools to "guarantee that the student actually make any progress at all." *CJN v. Minneapolis Pub. Sch.*, 323 F.3d 630, 642 (8th Cir. 2003). An IEP "need not be designed to maximize a student's potential commensurate with the opportunity provided to other children." *Id.*, at 638-39 (quotation omitted). Rather, "the requirements of the IDEA are satisfied when a school district provides individualized education and services sufficient to provide disabled children with some educational benefit." *Neosho R-V Sch. Dist. v. Clark,* 315 F.3d 1022, 1027 (8th Cir. 2003) (quotation omitted); *see Fort Zumwalt Sch. Dist. v. Clynes,* 119 F.3d 607, 612 (8th Cir. 1997).

A school meets its legal obligations under the IDEA when it: "(1) complies with the law's procedures in developing an IEP, and (2) the resulting IEP is 'reasonably calculated to enable the child to receive educational benefits.'" *Lathrop*, 611 F.3d at 424 (citation omitted). "An IEP should be set aside only if procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the

formulation process, or caused a deprivation of educational benefits." *S.D. by J.D.,* 88 F.3d at 562 (quotation omitted). An individualized education program passes muster substantively when it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. Ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017). "The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials." *Id*. (quoting *Rowley*, 458 U.S. at 207). Courts reviewing an education program "must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id*. (emphasis in the original).

## V. Appeal Of Final Decision And Order From Expedited Due Process Hearing

School District appeals the Hearing Officer's Final Decision and Order from the expedited due process hearing arguing that the Hearing Officer's findings of fact and conclusions of law are erroneous (Dkt. Nos. 31, ¶ 3; 58-2, ¶ 3). School District asserts that it is the party aggrieved by the Hearing Officer's Final Decision and Order and that it is the proper party to bring this appeal (*Id.*). Parents concur (Dkt. No. 34, ¶ 4).

### A. A.R.S. Was Not Confronted By The School Administrators Or Police Regarding Other Social Media Posts

School District first argues that the Hearing Officer erroneously found that A.R.S. "was not confronted by the school administrators nor the Police to describe the other social media pictures and conversations in their context." (Dkt. Nos. 31, ¶ 5; 58-2, ¶ 22). School District argues that the Hearing Officer's conclusion was wrong because School District administrators had extensive conversations with A.R.S. on March 2, 2018, at school (*Id.*).

In the Final Decision and Order, the Hearing Officer details the facts regarding A.R.S.'s various posts on social media (Dkt. No. 30-1, at 4-6). When Ronnie Simmons, Principal of Vilonia

Freshman Academy, talked with A.R.S. at school on March 2, 2018, Mr. Simmons was aware of the video A.R.S. posted on social media depicting A.R.S. holding a rifle with the text "#ILOVEITWHENTHEYRUN" at the bottom of the image (*Id.*, at 4). At that time, Mr. Simmons had also seen a compilation video posted by A.R.S. including various images and short videos such as: A.R.S. with a belt around his neck with the statement underneath, "I almost f****d up real bad;" an image of A.R.S. with his head marked out in red; A.R.S. yelling at a mirror with the acronym "ESKETIT" on the screen; and a different student sitting at a desk with a circle drawn around him in red (*Id.* at 4-5).

According to the Final Decision and Order, in the afternoon of March 2, 2018, after Mr. Simmons' conversation with A.R.S. in the morning, Mr. Simmons saw two additional videos posted by A.R.S. on social media (*Id.*, at 4). In one video, A.R.S. states, "I fight to kill, I don't fight to hurt people," and in the other video A.R.S. states, "I will send a straight bullet" while holding a handgun (*Id.*, at 4-5). On or about April 2, 2018, Mr. Simmons learned about several messages that were exchanged on social media between A.R.S. and other students (*Id.*, at 6). The messages that A.R.S. sent refer to hurting another student and self-harm, including: "I'm gonna kill [other student] and then shoot myself;" "Tell [other student] to shut up before he dies;" "I tried to hang myself. Is that funny;" "depression has never taken you over has it." (School District Exp. Hearing Exs., at 7-13). According to the trial testimony of Mr. Simmons on direct examination, A.R.S. sent the text messages on January 5, 2018 (Ex. Hearing Trans, at 44).

The Hearing Officer analyzed these facts and found that "[w]ith the exception of the Student being able to describe the weapon in the first media photo to the Principal as an Airsoft toy he was not confronted by the school administrators, nor the Police to describe the other social media pictures and conversations in their context." (Dkt. No. 30-1, at 7). The Hearing Officer

also quoted Ronnie Simmons, Principal of Vilonia Freshman Academy, from his testimony on cross examination regarding some of A.R.S.'s social media posts that, "I don't know specific context without [A.R.S.] explaining that to me." (*Id.*). According to the expedited hearing testimony of Mr. Simmons on cross examination, A.R.S. "did get to explain some of the information. But if you are talking about this additional information that I found in the afternoon . . . then, no, he did not, because there was not another meeting where [A.R.S.] was there." (Ex. Hearing Trans, at 113).

Based on the record evidence before the Court, Mr. Simmons became aware of various social media posts and text messages created by A.R.S. both before and after their meeting on the morning of March 2, 2018. School District has failed to meet its burden to show by a preponderance of the evidence that the Hearing Officer's finding was erroneous. Giving due weight to the Hearing Officer's decision, the Court agrees with the Hearing Officer and concludes that he was not in error in finding that A.R.S. "was not confronted by the school administrators nor the Police to describe the other social media pictures and conversations in their context." To the extent School District argues that this issue is irrelevant to the overall determination (Dkt. No. 58-2, ¶ 22), under the circumstances presented here, the Court disagrees.

### B. A.R.S. Made The Social Media Posts Off Campus And Did Not Address Any One Person

School District next argues that the Hearing Officer erroneously excused the actions engaged in by A.R.S. which resulted in his suspension because the "incident was not posted while the Student was in school or on school property [and] was not addressed to any one person or audience." (Dkt. Nos. 31, ¶ 6; 58-2, ¶ 23). School District further argues that where and to whom A.R.S. made the social media posts is not probative of whether A.R.S. is a danger to himself or to others (*Id.*). School District also argues that the Hearing Officer's finding is inconsistent with the

13

evidence that A.R.S. made threats against a specific student that were provided to the principal by a student during the week of April 9, 2018 (*Id.*).

The compilation video that A.R.S. posted includes a picture of a different student sitting at a desk with a circle drawn around him in red (Dkt. No. 30-1, at 5). When Mr. Simmons was asked about this particular post on cross examination, he testified that he talked to A.R.S. about the picture and "[h]e said that . . . this student was a friend of his and that . . . he circled that particular student in the picture because he thought his face looked funny or goofy." (Ex. Hearing Trans, at 63). When asked on cross examination whether he confirmed that the student circled in the picture was a friend of A.R.S., Mr. Simmons testified, "I asked that student about it, and he confirmed that he was a friend of his." (*Id.*). According to the hearing testimony of Mr. Simmons on cross examination, he looked up where the phrase used in one of A.R.S.'s videos, "I love it when they run," came from and "found those in the lyrics of a song." (*Id.*, at 74).

When he was asked on cross examination about the text messages that were discovered on April 2, 2018, Mr. Simmons testified that the text messages referred to an argument between A.R.S. and a male student over a female student (*Id.*, at 129-30). Mr. Simmons further testified that he "thought that [the argument] had all been resolved" between A.R.S. and the other male student (*Id.*, at 130). According to Mr. Simmons, these text messages were sent on January 5, 2018 (*Id.*, at 44). When asked by the Hearing Officer during the expedited hearing if A.R.S. "engaged in any particular aggressive behaviors, hurting other people," Mr. Simmons testified that he was not aware of any such instances while he was at Vilonia (*Id.*, at 135). Mr. Simmons further testified, "I don't recall him actually getting into a physical altercation with anyone." (*Id.*).

School District does not dispute the Hearing Officer's finding that A.R.S. made all of the social media posts relevant to this case when he was not at school or on school property (Dkt. No.

31, ¶ 6).  In the text messages discovered by Mr. Simmons on April 2, 2018, A.R.S. states that he wanted to harm another student and commit self-harm.  However, those text messages were sent on January 5, 2018, and are not referenced in the videos or pictures that A.R.S. posted in late February and early March 2018.  The Hearing Officer reasoned that School District "has not provided evidence that the Student threatened to commit a crime of violence or to kill anyone in particular other than himself."  (Dkt. No. 30-1, at 11).  The Hearing Officer further reasoned that, "[w]hile it can be argued that the lyrics of the Student's rap song which stated 'I like to see them run' while holding an Airsoft rifle could be construed as a threat to commit a crime of violence, it was not directed toward any individual or facility."  (*Id.*).

School District has failed to meet its burden of proof and to show that the Hearing Officer's conclusion was erroneous.  School District has not moved to supplement the record with additional proof to meet its burden.  Giving due weight to the Hearing Officer's decision, the Court agrees with the Hearing Officer and concludes that he was not in error in finding that the "incident was not posted while the Student was in school or on school property [and] was not addressed to any one person or audience."  To the extent School District argues that the Hearing Officer relied on this determination to "erroneously excuse[] the actions engaged in by A.R.S. which resulted in his suspension" (Dkt. Nos. 31, ¶ 6; 58-2, ¶ 23), under the circumstances presented here, the Court disagrees.  The Court rejects School District's argument that these factors are "not probative on the issue of whether A.R.S. is a danger to himself or others." (*Id.*).  In reaching his overall decision based on this and other evidence, the Hearing Officer related this evidence and these factors to prior decisions and controlling law on this issue.

### C.     Placement Of A.R.S. In Regular School Environment

School District argues that the Hearing Officer erroneously concluded that A.R.S. should be returned to his placement in a regular school environment (Dkt. Nos. 31, ¶ 7; 58-2, ¶ 24). School District further argues that the testimony at the expedited due process hearing, and given in the preliminary injunction hearing in this Court, shows that A.R.S. should be placed on an interim basis either in residential treatment, supported by Parents and suggested by the traumatic brain injury consultant, or day treatment, School District's proposed placement, based on A.R.S.'s significant risk of harm to himself and others (*Id.*).

In the Final Decision and Order for the expedited due process hearing, the Hearing Officer concluded School District "will immediately upon receipt of this order notify the Parents and the Student that he will be receiving his special education services at the previously agreed upon location as contained in his amended IEP of October 25, 2017." (Dkt. No. 30-1, at 18). As the Court discussed above, School District has failed to meet its burden to show by a preponderance of the evidence that the Hearing Officer's decision that A.R.S. should remain in his current placement was in error. Because the Hearing Officer found that A.R.S.'s current placement is not substantially likely to result in injury to A.R.S. or to others, he did not have to order a change in placement of A.R.S. to an appropriate interim alternative educational setting for not more than 45 school days. *See* 20 U.S.C. § 1415(k)(3)(B)(ii)(II).

School District further argues that A.R.S. should be placed on an interim basis either in residential treatment or day treatment. According to the expedited hearing testimony of T.S. on direct examination, A.R.S.'s doctors and treatment therapists "said that day treatment is not where [A.R.S.] needs to be at this time." (Ex. Hearing Trans, at 183). T.S. further testified that A.R.S.'s doctors and treatment therapists recommended A.R.S. "to be in school, but with the appropriate

IEP that he needs for the education level . . . ." (*Id.*). T.S. also testified that she would have agreed to allowing A.R.S. to go to Timber Ridge, which is residential treatment and which was recommended by Aleecia Starkey, Traumatic Brain Injury expert, if School District suggested that placement (*Id.*). School District has not presented any evidence that refutes T.S.'s positions. The Court has reviewed the record evidence School District cites regarding testimony from Elizabeth Kelley, the Director of Special Education for the District (Ex. Hearing Trans., at 143-49). Her later testimony confirms that no "healthcare professional has recommended day treatment." (*Id.*, a 148). Further, before this Court and before the Hearing Officer, Mr. Simmons was unable to testify what mental health professional had recommended the more restrictive school environment of a day treatment center that was being advocated for placement by School District (HO Regular Due Process Final Decision and Order, at 32).

In the Hearing Officer's Final Decision and Order, he also analyzed the requirement under the IDEA that the hearing officer may change a student's placement for 45 days to an appropriate interim alternative educational setting, "if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or to others." (Dkt. No. 30-1, at 18) (quoting 20 U.S.C. 1415(k)(3)(B)). The Hearing Officer reasoned that, despite the lack of a "bright-line rule," A.R.S.'s behavior based on evidence and testimony presented during the emergency hearing does not meet the requirement under the statute (*Id.*, at 18); *see also C.H. v. Salem City Bd. of Educ.*, 116 LRP 1023 (SEA Ca. Nov. 19, 2013) (finding that the student should be returned to the current placement because the student did not threaten anyone, even though violent song lyrics were found written in the student's journal); *Sharon Public Schools*, 45 IDELR 75 (SEA Mass. Feb. 13, 2006) (finding that the student should be returned to the current placement because the instances of violence were isolated, despite the student pushing

a desk into the teacher's thighs and punching the teacher's wrist). The Hearing Officer also cites to *Clinton County R-III School District v. C.J.K.*, where the district court analyzed the "substantially likely to result in injury to the child or to others" standard in the context of applying an exception to the statutory "stay put" provision (Dkt. No. 30-1, at 16). 896 F. Supp. 948 (W.D. Mo. Aug. 9, 1995). In that case, the district court reasoned that, even though the student threatened to commit violence to a teacher, leaving the student at the current placement was not substantially likely to result in injury to the student or to others because the student did not have a record of violent acts and said that he did not intend to carry out the violent acts. *Id.*, at 950-51.

School District has failed to meet its burden of proof and to show that the Hearing Officer's conclusion was erroneous. To the extent School District attempts to rely on this Court's April 11, 2018, preliminary injunction order as a basis to maintain the Hearing Officer's conclusion was erroneous, the Court rejects the argument. School District has not moved to supplement the record with additional proof to meet its burden. School District has not presented any additional cases or legal authorities that contradict the cases and legal authorities cited by the Hearing Officer. For these reasons, giving due weight to the Hearing Officer's Final Decision and Order, the Court agrees with the Hearing Officer's decision to return A.R.S. to his placement in a regular school environment.

### D.    Treating Psychiatrist's Note

School District argues that the Hearing Officer erroneously credited the note completed by A.R.S.'s treating psychiatrist, Dr. Ivan O. Aldea, M.D., dated March 5, 2018 (Dkt. Nos. 31, ¶ 8; 58-2, ¶ 25). School District further argues that it has not seen the treating psychiatrist's records and the records of A.R.S.'s March 5, 2018, admission to an acute care facility (*Id.*). School District asserts that the treatment records are necessary to ascertain precisely what facts A.R.S. and Parents

made the medical providers aware of that informed the provider's decision regarding A.R.S. as a threat risk to himself and others (*Id.*).

On April 3, 2018, School District issued a subpoena *duces tecum* requesting Unity Health Courage ("Unity Health") to produce "[a]ll documents regarding A.R.S." who was admitted to Unity Health on March 5, 2018, and discharged on March 13, 2018 (Dkt. No. 21-1, at 2). School District's motion to compel seeks an order from the Court compelling Unity Health to comply with the subpoena (Dkt. No. 21, ¶ 4). In this Court's Order from April 23, 2018, the Court denied School District's motions to compel compliance with subpoena and for protective order (Dkt. No. 29, at 5-6).

In that Order, the Court reasoned that the records School District sought were not relevant to an ongoing dispute pending before the Court at that time (*Id.*, at 3). During the hearing on School District's motion for preliminary injunction, after a relevance objection was made to a question regarding the treatment records, counsel for School District stated that the records were "probably not" relevant to the decision before the Court during the hearing (*Id.*, 4). In the Order, the Court informed the parties that, if the medical records desired by School District have not been obtained by the time the Hearing Officer's final decision is appealed, School District may move the presiding court to compel Parents or Unity Health to disclose the records (*Id.*, at 5). School District did not move for such a request in this Court after the Hearing Officer's final decision was appealed.

In this Court's Order from April 23, 2018, the Court further reasoned that, under Arkansas law, the hearing officer presiding over the state due process claim has subpoena power to request a witness testify regarding, or to subpoena, the medical records himself (*Id.*, at 4-5). *See* Ark. Code Ann. § 6-41-216 (e)(1) ("An individual serving as a qualified hearing officer under this

section shall have the power to issue subpoenas and to bring before him or her as a witness any person in this state."); Arkansas Dep't of Educ., Special Educ. and Related Servs., Impartial Due Process Hearing Procedures, 10.01.22.6 (July 2008). There is no evidence in the record that the Hearing Officer compelled the Parents or Unity Health to disclose the records.

School District argues that the following facts show that A.R.S.'s mental and emotional instability do not support Dr. Aldea's note from March 5, 2018 (Dkt. No. 31, ¶ 8). School District asserts that testimony from the due process hearing indicated that in the fall of 2017 A.R.S. appeared to pose a risk of self-harm to School District staff, who intervened and contacted T.S., who concluded that the risk was not significant at that time (*Id.*). In mid-February 2018, A.R.S. calmly told a School District intern at school that he wanted to kill someone and go to prison for the rest of this life (*Id.*). Following the social media posts from March 1, 2018, School District staff spoke with A.R.S. at school on the morning of March 2, 2018, where A.R.S. appeared to be fairly stable but mentioned that he was depressed and needed help (*Id.*). When asked if he thought he needed to be admitted to acute care, A.R.S. stated that he could get out in three days because he "knew what to say." (*Id.*). On March 5, 2018, only hours after Dr. Aldea concluded that he "does not pose a threat to himself or others and does not meet the criteria for acute hospitalization," Parents admitted A.R.S. to an acute care facility where he stayed for eight days (*Id.*).

School District has not presented any additional evidence that the Hearing Officer did not have at the time of his decision that would discredit Dr. Aldea's letter. Further, in its recitation of events, School District omits other record evidence that puts this determination in context. In addition, the Hearing Officer referenced the treatment summary completed by Dr. Laura B. Horton, A.R.S.'s treating psychologist, on April 5, 2018 (Parents Ex., at 28-32). As the Hearing Officer found, that report shows that accommodations in the school environment would help

A.R.S. and that he had "*no* current thoughts or plans to harm himself or others . . . ." (*Id.*, at 29) (emphasis in original). Giving due weight to the decision of the Hearing Officer, the Court agrees with the Hearing Officer's conclusion to credit Dr. Aldea's letter.

### E.    School District Did Not Complete Manifestation Determination

School District also argues that the Hearing Officer erroneously found that the "action of not allowing the Student to return to school following his ten day suspension . . . even though a manifestation determination had not been completed . . .," which implied that School District was at fault for not completing the manifestation determination review (Dkt. Nos. 31, ¶ 9; 58-2, ¶ 26). School District argues that the manifestation determination was not completed because Parents postponed the manifestation determination conference scheduled for March 7, 2018, based on their wish to have A.R.S.'s medical providers present at the conference (*Id.*). School District further argues that Parents canceled the March 14, 2018, manifestation determination conference because they filed a state due process complaint on March 13, 2018 (*Id.*).

The IDEA outlines the following requirements for a manifestation determination review after School District suspended A.R.S. for 10 days:

> [W]ithin 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local education agency, the parent, and relevant members of the IEP team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—
>
> (I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or
> (II) if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.
>
> If the local educational agency, the parent, and relevant members of the IEP Team determine that either subclause (I) or (II) of clause (i) is applicable for the child, the conduct shall be determined to be a manifestation of the child's disability.

20 U.S.C. § 1415 (k)(1)(E).

The expedited hearing testimony of Mr. Simmons on direct examination supports School Districts positions regarding the lack of a manifestation determination review. Parents postponed the March 7, 2018, meeting because they wanted A.R.S.'s healthcare providers at the meeting, and the rescheduled March 14, 2018 meeting did not occur because Parents filed a Due Process Complaint the day before (Ex. Hearing Trans, at 57-58). The Court will not determine what the Hearing Officer did or did not imply by stating that the "action of not allowing the Student to return to school following his ten day suspension . . . even though a manifestation determination had not been completed . . . ." (Dkt. No. 30-1, at 12). Based on the expedited hearing testimony and the record evidence, the Court agrees with the Hearing Officer's finding that School District did not allow A.R.S. to return to school following his ten-day suspension, even though School District and Parents did not complete a manifestation determination review (*Id.*).

Further, School District does not present any evidence or case law to support its argument that the Hearing Officer's implication that School District was at fault for not completing the manifestation determination review is a reason to find the Hearing Officer's decision erroneous. The School District has failed to meet its burden of proof on this issue. For these reasons, the Court agrees with the decision of the Hearing Officer and does not find his determination that School District did not allow A.R.S. to return to school after the ten-day suspension, even though a manifestation determination review was not completed, was erroneous.

> **F.** **Consulting A.R.S.'s Treating Mental Health Professionals Before Not Permitting Him To Return To School**

School District argues that the Hearing Officer erroneously found that "none of the Student's responsible agents at the school sought permission from the Parent to consult with any of [his] treating mental health professionals before taking the action of not permitting him to return

to school." (Dkt. Nos. 31, ¶ 10; 58-2, ¶ 27). School District argues that the Hearing Officer's decision ignores the fact that School District offered a mobile psychiatric assessment to Parents on the morning of March 2, 2018, which was rejected (*Id.*). School District also argues that the Hearing Officer ignored that School District unsuccessfully attempted to obtain Parents' permission to consult with A.R.S.'s medical providers (*Id.*).

In the Hearing Officer's Final Decision and Order, he found that T.S. rejected the School District's offer to conduct a mobile psychiatric assessment on March 2, 2018 (Dkt. No. 30-1, at 5). The expedited hearing testimony of Mr. Simmons on direct examination and the Permission for Mobile Assessment form signed on March 2, 2018, also support the Hearing Officer's finding and School District's assertion regarding the mobile psychiatric assessment (Ex. Hearing Trans, at 51; School District Ex., at 16). Even though Parents rejected Mr. Simmons' offer to perform a mobile assessment, School District has not shown why that fact makes the Hearing Officer's finding that School District did not consult with any of A.R.S.'s treating mental health professionals before taking the action of not permitting him to return to school erroneous. The School District has failed to meet its burden of proof.

School District also argues that the Hearing Officer ignored that School District unsuccessfully attempted to obtain Parents' permission to consult with A.R.S.'s medical providers. School District cites to this Court's Order from April 11, 2018, where the Court stated, "Mr. Simmons also testified that T.S. was closed to the suggestion that School District communicate directly with A.R.S.'s counselors, a contention not fully supported by the record evidence." (Dkt. No. 20, at 22). School District has not presented any additional evidence or cited to record evidence that contradicts this Court's finding that the contention was not fully supported by the record then presented to this Court.

Further, the Hearing Officer noted that, in October 2017, "the Parents agreed that the District could receive information from the Student's therapist at Families First." (HO Regular Due Process Final Decision and Order, at 12). The Hearing Officer also determined that, on February 8, 2018, School District "obtained parental consent to receive health information from the Student's health care providers as well as consent to release personally identifiable information about the Student to his health care providers (*Id.*, at 18). School District has not presented any additional evidence or cited to record evidence that contradicts these determinations.

The Court concludes that School District has failed to meet its burden of proof on this point. For these reasons, giving due weight to the Hearing Officer's decision, the Court agrees with the decision of the Hearing Officer and concludes that his decision that none of A.R.S.'s responsible agents at the school sought permission from the Parents to consult with any of his treating mental health professionals before taking the action of not permitting him to return to school was not erroneous.

### G.     Immediacy Of The Threat And Likelihood Of Threat From Song Lyrics

School District argues that the Hearing Officer erroneously found that "there is no evidence [A.R.S.] shared or performed the song (referring to the rap song lyrics 'I like to see them run') with anyone so as to cause a victim to believe the immediacy of the threat and the likelihood that it would be carried out." (Dkt. Nos. 31, ¶ 11; 58-2, ¶ 28). School District further argues that the Hearing Officer's decision ignores the evidence that a parent and students at Vilonia Freshman Academy contacted the school principal to inform him of their concerns (*Id.*).

In the Hearing Officer's Final Decision and Order, he found that Mr. Simmons "was informed by the parent of another student of a social media screen shot which depicted the Student 'holding a gun of some type up in front of himself with a hash tag across the bottom that said, "I

love it when they run."'" (Dkt. No. 30-1, at 4). The expedited hearing testimony of Mr. Simmons on direct examination supports this finding (Ex. Hearing Trans., at 30). School District has not presented any additional evidence to show that the Hearing Officer's finding was erroneous. School District has also failed to show why the fact that a parent sent A.R.S.'s social media posts to Mr. Simmons makes the Hearing Officer's decision erroneous. Even if the Court construed School District to argue that the parent who contacted Mr. Simmons or the parent's child believed that the song lyrics were a threat, School District does not present additional evidence to support this claim.

To the extent School District challenges the Hearing Officer's determination regarding the "immediacy" of the situation, the record evidence is that, when informed of the posts on March 1, 2018, Mr. Simmons did not contact Parents or A.R.S. the day he was informed of the posts (Dkt. No. 30-1, at 4). Instead, he contacted law enforcement. There is no record evidence that law enforcement took action that same day (*Id.*). Instead, the record evidence is that law enforcement stated that they would monitor A.R.S. the next morning on his way to school and have a presence at school that morning (*Id.*). School District presents no additional evidence on this point.

The Court concludes that School District has failed to meet its burden of proof. For these reasons, giving due weight to the Hearing Officer's decision, the Court agrees with the decision of the Hearing Officer and concludes with his decision that no evidence demonstrated that A.R.S. shared or performed song lyrics with anyone so as to cause a victim to believe the immediacy of the threat and the likelihood that it would be carried out.

In conclusion, the Court agrees with the Hearing Officer's decision to deny School District's request to move A.R.S. to an alternative placement for 45-days and order that A.R.S. be returned to his previously agreed upon location as contained in his amended IEP.

## VI.     Appeal Of Final Decision In Regular Due Process Hearing

School District also appeals the Hearing Officer's Final Decision and Order in Arkansas Department of Education Special Education Unit Case No. H-18-22 (Dkt. Nos. 51; 58-2, ¶¶ 42-51).  School District argues that the Hearing Officer's findings of fact and conclusions of law in the Final Decision and Order are erroneous (Dkt. Nos. 51, ¶ 2; 58-2, ¶ 42-51).  School District asserts that it is the party aggrieved by the Hearing Officer's Final Decision and Order and that it is the proper party to bring this appeal (Dkt. Nos. 51, ¶ 2; 58-2, ¶ 3).  Parents admit that School District is the party aggrieved (Dkt. No. 55, ¶ 2).

School District argues that the evidence shows that the School District complied with the procedures set forth in the IDEA and pertinent federal and state regulations (Dkt. No. 51, ¶ 2).  School District further argues that the educational plan and services provided by School District were reasonably calculated to enable A.R.S. to receive educational benefits (*Id.*).  School District argues that several of the Hearing Officer's findings of fact and conclusions of law are erroneous, including the Hearing Officer's ultimate decision that School District has violated the free appropriate public education requirement under the IDEA.

### A.     School District Ignored Stay-Put Order

School District first argues that the Hearing Officer erroneously found that School District chose to ignore the stay-put issued by the Hearing Officer on March 27, 2018 (Dkt. Nos. 51, ¶ 3(a); 58-2, ¶ 42).  School District asserts that the School District did not ignore the stay-put order because it sought relief in this Court pursuant to the IDEA (*Id.*).

In response, Parents assert that the Hearing Officer correctly found that School District chose to ignore the law (Dkt. No. 55, ¶ 3(a)).  Parents further cite to this Court's Order from May 14, 2018, where the Court concluded that the "School District unilaterally opted not to follow [the

IDEA's stay put provision and implementing regulations]." (Dkt. No. 42, at 7). However, the Court's Order from May 14, 2018, references Parents' motion for preliminary injunction based on the Hearing Officer's Final Decision and Order in the expedited state due process case, not the stay-put order issued on March 27, 2018 (*Id.*).

In the Final Decision and Order, the Hearing Officer found that School District "elected to ignore" the stay-put order issued on March 27, 2018, and "refused to allow the Student to return to school." (HO Regular Due Process Final Decision and Order, at 3-4). School District does not state that it complied with the stay-put order, but it instead argues that School District did not ignore the stay-put order only because School District sought relief from the Court from obeying the stay-put order. School District is correct that it filed a lawsuit in Circuit Court in Faulkner County, Arkansas, on the same day the stay-put order was issued, March 27, 2018, seeking a temporary restraining order and preliminary injunction against the stay-put order (Dkt. No. 2). If the Court construes School District to argue that filing the lawsuit in Circuit Court creates an automatic stay on the stay-put order issued by the state hearing officer, School District has not cited any authority in support of this proposition.

School District's proposition that filing a lawsuit for a temporary restraining order and preliminary injunction against the enforcement of a stay-put order creates an automatic stay on the stay-put order is not supported by the IDEA. The "stay-put" provision under the IDEA provides that during an administrative or judicial proceeding, the child shall remain in his "current educational placement." 20 U.S.C. §§ 1415(j), (k)(3); *see also* 34 C.F.R. §§ 300.518, 300.532 (implementing regulations). The congressional intent of the stay-put provision is to ensure that public schools do not remove handicapped children over parents' objections pending completion of legal proceedings. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373 (1985).

The stay-put provision creates a strong presumption that children remain in their current educational placements while their parents and school districts sort out the legal ramifications. *Honig,* 484 U.S. at 328. School District has not cited any authority that supports its argument.

For these reasons, and giving due weight to the Hearing Officer's Final Decision and Order, the Court agrees with the Hearing Officer's finding that School District ignored the stay-put order issued on March 27, 2018, and refused to allow A.R.S. to return to school.

### B. Hearing Officer Made Findings Of Fact And Conclusions Of Law Outside The Relevant Time Frame

School District next argues that the Hearing Officer erroneously made findings of fact and conclusions of law based on actions that occurred before and after the time frame of Special Education Unit Case No. H-18-22 (Dkt. Nos. 51, ¶ 3(b); 58-2, ¶ 43). School District asserts that the previous due process case was settled on February 6, 2018, and Parents filed the current due process complaint on March 13, 2018 (*Id.*). School District points to the Hearing Officer's criticism of A.R.S.'s diagnosed disability under the IDEA, the inappropriate behavior plan, a consultant's criticisms of the IEP, and an inappropriate IEP, which all occurred prior to February 6, 2018 (*Id.*). In response, Parents assert that the Hearing Officer properly considered evidence of events occurring before February 6, 2018, because he only considered them to establish a pattern of events or actions (Dkt. No. 55, ¶ 3(b)).

In Parents' due process complaint, they seek the following relief, in pertinent part:

a. The Parents be entitled to place the Student in a private school placement at District expense or Compensatory Special Education and Related Services for the denial of Free Appropriate Public Education;

b. The development of an appropriate IEP to be implemented in the Least Restrictive Environment, specifically to include a Functional Behavior Assessment, Behavioral Intervention Plan, individualized instructional program to address the Student's TBI deficits and depression and their impact on his academic achievement, social skills training, and teaching strategies to address the Student's

behavioral and emotional dysfunction and to provide opportunities for rehabilitation with and interaction with the Student's non-disabled peers . . . .

(Parents Due Process Complaint, at 13).

In making his determination, the Hearing Officer reviewed: a neuropsychological evaluation conducted by pediatric neuropsychologist Kelly Jarratt, Ph.D., on July 7, 2017; a psychoeducational evaluation conducted by Josh Hart, School District's assistant special education supervisor and school psychology specialist, during the spring and summer of 2017; an occupational therapy evaluation conducted by Lisa L. Merguie, OTR/L, on July 12, 2017 (HO Regular Due Process Final Decision and Order, at 7-10). The Hearing Officer also listened to hearing testimony from Mr. Hart and Aleecia Starkey, a brain injury consultant.

In the Final Decision and Order, the Hearing Officer found that, "[i]n the course of the hearing both parties were permitted to present evidence and testimony with regard to events and actions that occurred prior to February 6, 2018, but only within the context of establishing patterns of events and actions rather than the facts of each event or action." (*Id.*, at 6). The Hearing Officer found that Dr. Jarratt's neuropsychological evaluation revealed that A.R.S. "showed dysfunction with systems controlled and mediated by the frontal and prefrontal lobe areas of the brain," which negatively affects A.R.S.'s "behavioral, emotional and cognitive regulation skills." (*Id.*, at 31). The Hearing Officer also found that "[t]hese deficits appear to not have been considered when determining the Student's initial IEP and consequently not considered when developing his original BIP (*Id.*). Because the Hearing Officer is making findings regarding A.R.S.'s disability and the appropriateness of his current IEP and BIP, the Hearing Officer's findings relate directly to the relief requested by Parents.

The Hearing Officer also found that, "[t]he identification and evaluation process initially implemented by the District failed to take into consideration the assessments obtained by the

Parents from either his treating mental health providers, the occupational therapist, or the neuropsychologist." (*Id.*, at 36). The Hearing Officer further stated, "The consequence of their failure to look and take into consideration these findings resulted in the development of an inappropriate IEP as well as an inappropriate BIP." (*Id.*). The Hearing Officer's findings related directly to Parents' request for relief in their due process complaint.

Even though A.R.S.'s IEP and BIP were created before the beginning of the Fall 2017 semester, several months before the relevant time frame for the due process complaint, the Hearing Officer's findings regarding those issues relate directly to the relief requested by Parents in the due process complaint. Further, the Hearing Officer gave the opportunity for both School District and Parents to present evidence at the state due process hearing regarding facts that occurred before February 6, 2018. Finally, in order to determine if School District provided A.R.S. with a free appropriate public education, the Hearing Officer must decide that that School District has complied with the IDEA's procedures in developing an IEP and the resulting IEP is reasonably calculated to enable A.R.S. to receive educational benefits. *See Lathrop*, 611 F.3d at 424.

Giving due weight to the Hearing Officer's decision, the Court agrees with the Hearing Officer and does not find his conclusions regarding A.R.S.'s diagnosed disability under the IDEA, the inappropriate behavior plan, a consultant's criticisms of the IEP, and an inappropriate IEP, which all occurred prior to February 6, 2018, were in error. To the extent the Hearing Officer made findings of fact and conclusions of law that are outside the time frame of Special Education Unit Case No. H-18-22 and Parents' due process complaint, the Court will give those findings and conclusion due weight when making a decision on the ultimate conclusion of School District's appeal.

## C. Settlement Agreement From The Previous State Due Process Case

School District argues that the Hearing Officer found that the February 5, 2018, settlement agreement from the previous due process complaint required Parents to try to work out any points of disagreement prior to filing a due process complaint in the future, but he erroneously decided not to impose any consequences on Parents for violating the settlement agreement (Dkt. Nos. 51, ¶ 3(d); 58-2, ¶ 45). School District further asserts that the Hearing Officer ignored School District's efforts to schedule a manifestation determination review conference following March 2, 2018 (*Id.*).

In response, Parents argue that they did not violate the February 5, 2018, settlement agreement (Dkt. No. 55, ¶ 3(d)). Parents further argue that, if they did violate the settlement agreement, it is irrelevant for the case currently before the Court (*Id.*). Parents assert that this Court lacks jurisdiction to enforce the settlement agreement because School District has not filed a claim for breach of contract nor otherwise established a legally binding agreement (*Id.*). Parents finally argue that the Hearing Officer considered School District's efforts to schedule a manifestation determination review following March 2, 2018 (*Id.*).

In the Final Decision and Order, the Hearing Officer found that School District "provided the Parents with a notice of conference to be held on March 7, 2018, for the purpose of conducting a manifestation determination review . . . ." (HO Regular Due Process Final Decision and Order, at 25). The Hearing Officer further found that Parents postponed the manifestation determination review because they could not attend the meeting on 24-hour notice and needed to have additional members added to the team meeting (*Id.*, at 26). The Hearing Officer also found that School District notified Parents on March 12, 2018, that a manifestation determination review and IEP revision conference would be held on March 14, 2018 (*Id.*, at 29). The Hearing Officer found that

Parents filed their due process complaint on March 13, 2018, which canceled the March 14, 2018 meeting (*Id.*). Despite School District's arguments, the Hearing Officer did find that School District attempted to schedule a manifestation determination review conference after March 2, 2018.

Parents argue that the February 5, 2018, settlement agreement from the previous due process complaint is a legally binding agreement and that this Court lacks jurisdiction to enforce the settlement agreement. Under the IDEA, "[i]n the case that a resolution is reached to resolve the complaint . . . the parties shall execute a legally binding agreement that . . . is enforceable in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(f)(1)(B)(iii)(II). Also, an aggrieved party has the right to bring a civil action "with respect to the complaint presented pursuant to this section . . . ." *Id.* § 1415(i)(2)(A). Based upon this, School District may bring a claim based on the parties' settlement agreement. However, the Court declines to find that School District has done so here. School District has failed to present such a claim as a part of its appeal, has failed to meet its burden of proof with respect to such a claim, and has failed to articulate the appropriate relief should it prevail on such a claim.

Giving due weight to the Hearing Officer's Final Decision and Order, the Court agrees with the Hearing Officer and does not find error in his decision not to impose any consequences on Parents relating to the settlement agreement.

### D. School District's Decision To Contact Local Law Enforcement

School District also argues that the Hearing Officer made erroneous findings regarding School District's decision to contact local law enforcement in December 2017 and March 2018 (Dkt. Nos. 51, ¶ 3(e); 58-2, ¶ 46). School District further argues that the Hearing Officer erroneously failed to consider A.R.S.'s arrest and criminal charge relating to the social media posts

from February and March 2018 (*Id.*). School District asserts that the Hearing Officer erroneously found that A.R.S. did not commit any identifiable crime, despite law enforcement arresting A.R.S. for committing a crime (*Id.*). School District also asserts that the Hearing Officer even acknowledged that the IDEA allows school districts to report criminal acts by students with disabilities (*Id.*). In response, Parents argue that the Hearing Officer correctly found that A.R.S. did not commit a crime (Dkt. No. 55, ¶ 3(e)). Parents further argue that, even if the Hearing Officer's finding was in error, the finding is irrelevant (*Id.*).

The Hearing Officer found that on December 4, 2017, School District "called the local police department to address the issue of the Student 'acting up,'" which referred to A.R.S. destroying another student's school project (HO Regular Due Process Final Decision and Order, at 14). When local law enforcement arrived to the school, they "were informed that the Student refused to go to class and was going to be suspended." (*Id.*, at 15).

The Hearing Officer found that Mr. Simmons also contacted local law enforcement on March 1, 2018, and forwarded A.R.S.'s social media posts that Mr. Simmons received on that day from a parent at the school (*Id.*, at 23). The Hearing Officer noted that Mr. Simmons contacted local law enforcement before confronting A.R.S. or Parents about the social media posts (*Id.*). The Hearing Officer found that Mr. Simmons testified in the hearing that he left the decision of how to deal with A.R.S. up to the professional judgment of local law enforcement to determine if A.R.S. was out of control (*Id.*, at 23-24). The Hearing Officer concluded that A.R.S. was not present at the school and "was not presenting the school staff with any out of control behavior." (*Id.*, at 24). The Hearing Officer also found that the police filed an incident report regarding A.R.S.'s social media posts, which included several of the videos posted by A.R.S. (*Id.*, at 25).

In the Vilonia Police Department incident report from March 2, 2018, the incident is described as "harassing communications / knowingly allows their telephone to be used to" and a misdemeanor (School District Ex., at 30). That incident report also states that the prosecutor's office advised law enforcement "to cite and release [A.R.S.] to a guardian." (*Id.*, at 31). The Vilonia Police Department incident report from March 6, 2018, is based on information provided to the police regarding an interaction between A.R.S. and Kaitly O'Callaghan, a student intern at Vilonia Freshman Academy, during the week of February 12, 2018 (*Id.*, at 32-33). According to the report, while Ms. O'Callaghan helped A.R.S. with homework, A.R.S. talked to her about feeling depressed, self-harm, and wanting to "fight someone and end up killing them and go to prison [for] the rest of his life." (*Id.*, at 33). The report also states that the police informed Vilonia Freshman Academy that "we would document this incident." (*Id.*).

The Hearing Officer concluded that, "[w]hile it can be argued that the lyrics of the Student's rap song which stated 'I like to see them run' while holding a Airsoft rifle could be construed as a threat to commit a crime of violence, it was not directed toward any individual or facility." (HO Regular Due Process Final Decision and Order, at 37). The Hearing Officer also concluded that School District "did not provide evidence of a school policy prohibiting a student to write a statement referencing shooting a gun." (*Id.*, at 38).

According to A.R.S.'s most recent IEP, A.R.S. "is also receiving guidance through a district behavioral plan to assist him throughout the school day." (School District Ex., at 56). Under A.R.S.'s most recent BIP, when a problem behavior occurs, school staff are supposed to use "talking circles," "restorative justice," and "losing the opportunity to spend time with peers" when A.R.S. gains attention from peers based on problem behaviors (*Id.*, at 148). In the Final Decision and Order, the Hearing Officer found that the BIP was "developed to address maladaptive

behaviors" and "addressed talking back to staff and work avoidance." (HO Regular Due Process Final Decision and Order, at 6).

In the Final Decision and Order, the Hearing Officer made findings of fact and conclusions of law regarding the authority of a school district to contact local law enforcement concerning a student with a disability (*Id.*, at 39-41). The Hearing Officer correctly concluded that the IDEA does not "prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities . . . ." (*Id.*, at 39-40) (quoting 20 U.S.C. § 1415(k)(6)). The Hearing Officer further concluded that School District failed to show that A.R.S. "had committed any crime or to have even violated school policy." (*Id.*, at 41). The Hearing Officer found that contacting local law enforcement "would appear to be a violation of the Student's existing IEP and BIP." (*Id.*). The Hearing Officer also found that School District "failed to address the unique behavior deficits by not appropriately considering the needs associated with the Student's brain injury diagnosis and thus not addressing them in his IEP." (*Id.*).

The Hearing Officer concluded that "when a student with a disability clearly does not pose a threat of harm to herself or others, school personnel should first implement the behavioral interventions contained in the student's IEP before calling" law enforcement (*Id.*, at 40-41). In support of this conclusion, the Hearing Officer cites to and relies upon a prior case. According to the Hearing Officer, in the case upon which he relies, the hearing officer found that the school did not always correctly implement the student's IEP; that the student's IEP required school staff "to use a calm interaction style with Student and to minimize verbal interactions"; and that, despite the student's IEP, the school disciplined the student with time-outs, physical restraints, and automatic isolations, in addition to calling the campus police on four occasions. School District has not cited any cases that contradict the authorities cited by the Hearing Officer.

In December 2017 and March 2018, School District contacted local law enforcement regarding incidents that involved A.R.S. The relevant IEP and BIP only mention the use of "talking circles," "restorative justice," and "losing the opportunity to spend time with peers" when A.R.S. creates a behavior problem at school. The methods of discipline discussed in the IEP and BIP stand in stark contrast to School District calling local law enforcement to Vilonia Freshman Academy. As the Hearing Officer found, to the extent A.R.S.'s social media posts could be seen as a threat to commit a crime of violence, it was not directed toward any individual or facility. School District has the authority under the IDEA to call local law enforcement when a disabled student has committed a crime. After viewing the social media posts made by A.R.S., Mr. Simmons contacted local law enforcement. A.R.S. was arrested on March 2, 2018, at school after talking to Mr. Simmons. However, A.R.S. was released from custody to his mother because the prosecutors advised the police to cite and release A.R.S. to his guardian. School District has not presented any additional information to show that charges have been brought against A.R.S. for any crime related to the social media posts.

For these reasons, and giving due weight to the Hearing Officer's decision, the Court agrees with the Hearing Officer and does not find his findings and conclusions relating to Mr. Simmons' contacting local law enforcement are in error. Even if the Hearing Officer's findings regarding School District's communication with law enforcement were erroneous, those findings and conclusions do not make the Hearing Officer's final conclusions erroneous.

### E. School District's Knowledge Of The Reports By Dr. Aldea And Unit Health

School District argues that the Hearing Officer erroneously found that School District knew about the conclusions by Dr. Aldea and Unity Health that A.R.S. was not a danger on the dates those conclusions were made (Dkt. Nos. 51, ¶ 3(f); 58-2, ¶ 47). School District asserts that there

36

is irrefutable evidence that School District did not learn about Dr. Aldea's letter until the hearing in this Court on April 6, 2018 (*Id.*). School District also asserts that there is irrefutable evidence that School District did not receive the Unity Health discharge summary issued on March 13, 2018, until March 26, 2018, when the resolution conference was held (*Id.*). In response, Parents argue that the Hearing Officer did not conclude that School District knew about Dr. Aldea's letter or the Unity Health discharge summary until the hearing in this Court (Dkt. No. 55, ¶ 3(f)). Parents further argue that the Hearing Officer did not resolve the factual dispute between the parties because School District's position did not change after it learned of both documents (*Id.*).

In the Final Decision and Order, the Hearing Officer found that Parents obtained Dr. Aldea's letter on March 5, 2018 (HO Regular Due Process Final Decision and Order, at 27). The Hearing Officer stated that according to T.S., Dr. Aldea's report was presented to School District (*Id.*). The Hearing Officer also stated that, according to David Stephens, Superintendent of Vilonia School District, School District did not see Dr. Aldea's report or the Unity Health discharge summary until the hearing in this Court on April 6, 2018 (*Id.*). The Hearing Officer did not resolve the factual discrepancy. According to the hearing testimony of Mr. Stephens on direct examination, he would not have made a different decision regarding the placement of A.R.S. after reviewing Dr. Aldea's report and the Unity Health discharge summary (Hearing Trans., Vol. III, at 167-68).

School District has failed to show that the Hearing Officer made any conclusion regarding when School District was first able to review Dr. Aldea's report and the Unity Health discharge summary. School District has not met its burden of proof. Further, based on the hearing testimony of Mr. Stephens, School District would not have administered a different placement for A.R.S. in the light of the two documents. For these reasons, and giving due weight to the Hearing Officer's

decision, the Court agrees with the Hearing Officer and does not find his statements regarding when School District received Dr. Aldea's report and the Unity Health discharge summary were in error.

### F.   A.R.S's Social Media Posts Were Not Serious

School District also argues that the Hearing Officer erroneously found that A.R.S.'s social media posts were not serious because they were not addressed to any one person or audience (Dkt. Nos. 51, ¶ 3(g); 58-2, ¶ 48).  School District asserts that, based on the evidence, and the findings of this Court in a previous Order, A.R.S. is a substantial danger based on his social media posts (*Id.*).  The Court addressed this issue above; the Court does not find that the Hearing Officer's conclusion that A.R.S.'s social media posts were not serious because they were not addressed to any one person or audience was erroneous.  School District has not presented any additional evidence in the current appeal to support its argument.

On April 11, 2018, this Court preliminarily enjoined enforcement of the stay-put provision in A.R.S.'s case at that time (Dkt. No. 20, at 46).  The Court further ordered that "A.R.S. be placed on home-bound setting where School District provides a staff member to educate A.R.S. at an appropriate location until A.R.S.'s long-term placement can be finalized through the IDEA's administrative review process or, if Parents prefer, A.R.S. be placed in a day treatment facility until A.R.S.'s long-term placement can be finalized through the IDEA's administrative review process." (*Id.*).  The Court's Order was based on the limited record before it at that time, and even in that Order the Court expressed reservation with respect to whether School District had shown reasonable efforts to accommodate the child's disabilities so as to minimize the likelihood that the child would injure himself or others (*Id.*, at 39-42).  On May 14, 2018, this Court granted Parents' motion for preliminary injunction to the extent that School District was ordered to comply with

the Hearing Officer's Final Decision and Order from April 25, 2018, which ordered that A.R.S. be returned to his current placement at Vilonia Freshman Academy (Dkt. No. 42, at 15). This Court has already ordered that A.R.S. be returned to school in compliance with the Hearing Officer's decision, even with the evidence of A.R.S.'s social media posts. School District has failed to present any additional evidence in support of its argument. For these reasons, and giving due weight to the Hearing Officer's Final Decision and Order, the Court rejects School District's argument on this point.

### G. School District's Failure To Provide Free Appropriate Public Education

School District also argues that the Hearing Officer erroneously made findings against the School District regarding its alleged failure to provide any education to A.R.S. following March 2, 2018 (Dkt. Nos. 51, ¶ 3(c); 58-2, ¶ 49). School District asserts that the Hearing Officer's decision is erroneous because he found that Parents elected not to have School District provide homebound instructions or facilitate therapeutic day treatment services (*Id.*). School District further argues that the Hearing Officer erroneously concluded that School District failed to provide an appropriate education because the Hearing Officer concluded that "as maladaptive as were some of his academic behaviors, his academic achievements do not appear to have been jeopardized." (Dkt. No. 51, ¶ 3(h)).

In response, Parents argue that School District has failed to comply with the IDEA and educate A.R.S. consistent with his IEP after March 2, 2018 (Dkt. No. 55, ¶ 3(c)). Parents further argue that School District's duty to comply with the IDEA is not contingent on Parents cooperating with School District (*Id.*). Parents also argue that the Hearing Officer correctly determined that School District denied free and appropriate public education to A.R.S. because School District

failed to comply with the procedural requirements of the IDEA for a free appropriate public education (Dkt. No. 55, ¶ 3(h)).

In the Final Decision and Order, the Hearing Officer found that the parties were in "the process of developing a more appropriate IEP and deciding on the most appropriate placement for services" after the February 5, 2018, settlement agreement was finalized (HO Regular Due Process Final Decision and Order, at 34). The Hearing Officer further found that School District's actions to suspend and recommend expulsion of A.R.S. for behavior School District determined to be related to his disability led to the procedural and substantive violation of the IDEA's free appropriate public education protection (*Id.*, at 34, 45); *Lathrop*, 611 F.3d at 424 (holding that a school meets its legal obligations under the IDEA when it "(1) complies with the law's procedures in developing an IEP, and (2) the resulting IEP is 'reasonably calculated to enable the child to receive educational benefits.'")

Parents argue that School District's duty to comply with the IDEA is not contingent on Parents cooperating with School District (Dkt. No. 55, ¶ 3(c)). In support of this proposition, Parents cite to *Anchorage School District v. M.P.*, 689 F.3d 1047 (9th Cir. 2012). In *Anchorage School District*, the Ninth Circuit held that "participating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents." 689 F.3d at 1055. In that case, the school district argued that the parents were at fault for not updating the student's IEP because the parents left the IEP meeting and did not adequately communicate their concerns to the school district. *Id.* The Ninth Circuit reversed the district court's decision in favor of the school district and reasoned that the district court erred by improperly shifting the burden for substantive compliance with the IDEA from the school district to the parents. *Id.* This Court also has reviewed *Hale ex rel. Hale v. Poplar Bluffs R-I School District*, in which the issue of

cooperation was referenced.  280 F.3d 831, 833 (8th Cir. 2002).  In *Hale*, the Eighth Circuit Court of Appeals affirmed the district court and found that the school district violated the IDEA despite the allegations and evidence of parental non-cooperation.  *Id*. at 834.

In the Final Decision and Order, the Hearing Officer found that Parents "elected to not have the District provide home-bound services due to employment obligations of both parents and refused to allow the Student to attend a day treatment facility."  (HO Regular Due Process Final Decision and Order, at 4).  The Hearing Officer also found that A.R.S. "ha[d] been without access to an education well beyond the maximum of ten days as stipulated by the IDEA."  (*Id.*, at 30).

According to the hearing testimony of Mr. Stephens on direct examination, School District has tried to provide educational services to A.R.S. by offering homebound instruction, which Parents denied during a resolution meeting (Hearing Trans., Vol. III, at 162).  Mr. Stephens also stated that he had not personally contacted Parents to set up homebound instruction and is not aware of anyone who has (*Id.*, at 163).  During Mr. Stephens' testimony on direct examination, counsel for School District stated that he will stipulate that School District has not provided any educational services to A.R.S. since he was suspended, up until the date of the due process hearing on April 26, 2018 (*Id.*, at 162).

In the Hearing Officer's Final Decision and Order from the expedited due process hearing, the Hearing Officer ordered that A.R.S. receive special education services at the previously agreed upon location as contained in his amended IEP of October 25, 2017 (Dkt. No. 30-1, at 18).  In this Court's Order from May 14, 2018, the Court concluded that, based on the record evidence before it at that stage of the proceedings, School District had failed and continued to fail to provide A.R.S. with a free appropriate public education (Dkt. No. 42, at 11).  In that Order, this Court granted Parent's motion for preliminary injunction to the extent that School District was ordered to comply

with the hearing officer's Final Decision and Order from April 25, 2018, at least until such time as this Court resolves the pending appeal of final administrative decision or until further Order of this Court, whichever occurs first (*Id.*, at 15). Based on the status reports filed by both School District and Parents, A.R.S. returned to Vilonia Freshman Academy for the first time on May 16, 2018 (Dkt. Nos. 46, ¶ 1; 50, ¶ 1). There is no evidence that A.R.S. received any education services between March 2, 2018, and May 16, 2018.

Even though Parents elected not to have School District provide home-bound services due to employment obligations of both parents and refused to allow A.R.S. to attend a day treatment facility, School District is still obligated under the IDEA to provide a free appropriate public education. *See Lathrop*, 611 F.3d at 424; *see also Anchorage Sch. Dist.*, 689 F.3d at 1055. Further, on the record before this Court, School District has failed to present any evidence that it has attempted to provide A.R.S. educational services at all. School District has failed to meet its burden of proof. For these reasons, and giving due weight to the Hearing Officer's Final Decision and Order, the Court agrees with the Hearing Officer's finding that School District failed to provide any education to A.R.S. following March 2, 2018.

Regarding the School District's argument that the Hearing Officer erroneously concluded that School District failed to provide an appropriate education because the Hearing Officer concluded that "as maladaptive as were some of his academic behaviors, his academic achievements do not appear to have been jeopardized," (Dkt. No. 51, ¶ 3(h)), a student's IEP is required to be tailored to meet the requirements of a "free appropriate public education" and the unique needs of the student, *see Honig,* 484 U.S. at 311 (quoting 20 U.S.C. § 1414(a)(5)). For this reason, and giving due weight to the Hearing Officer's conclusion, the Court agrees with the

Hearing Officer and does not find on the record before it that his conclusion that School District failed to provide a free appropriate public education was erroneous.

Based on an independent review of the record, and giving due weight to the Hearing Officer's decision, the Court agrees with the Hearing Officer's conclusion that School District failed to provide a free appropriate public education to A.R.S. The Court agrees with the Hearing Officer that, while the parties were in the process of updating A.R.S.'s IEP pursuant to the February 5, 2018, settlement agreement, School District unilaterally suspended and moved to expel A.R.S. In addition, School District failed to follow the Hearing Officer's stay-put order and this Court's Order enforcing the Hearing Officer's Order denying School District's requested expedited due process relief and returning A.R.S. to his current placement. Further, School District, as the aggrieved party appealing the Hearing Officer's decision, has the burden of proof to show that the Hearing Officer's decision was erroneous and that it did provide a free appropriate public education. School District has failed to meet its burden. For these reasons, the Court agrees with the Hearing Officer's findings of fact and conclusions of law.

### VII. Parents' Counterclaim

In their answer to School District's appeal of final agency decision, Parents include a counterclaim and request IDEA attorneys' fees and costs (Dkt. No. 34, at 5). School District filed a response to the motion (Dkt. No. 35). The Court takes Parents' request for attorneys' fees and costs under advisement and orders the parties to submit supplemental briefing on the issue of attorneys' fees and costs in this case.

## VIII.   Conclusion

The Court denies School District's appeals.  The Court affirms the Hearing Officer's Final

Decisions and Orders in the expedited due process hearing conducted in Case No. EH-18-23 and

the due process hearing conducted in Case No. H-18-22 (Dkt. Nos. 31, 51).

It is so ordered, this 30th day of September, 2019.

_____
Kristine G. Baker
United States District Judge